IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER KYLE PRATER,

    Plaintiff,                            No. CIV S-06-1993 FCD GGH P

    vs.

MTA OLIVER, et al.,                  <u>ORDER</u> &

    Defendants.               <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

<u>Introduction</u>

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is 1) defendants' motion for summary judgment, filed on June 1, 2009, to which plaintiff filed an opposition on June 15, 2009,[1] after which defendants filed a reply on June 30, 2009; and 2) plaintiff's motion for sanctions, filed on June 3, 2009.

\\\\\

\\\\\

\\\\\

---

[1] In addition to his opposition, the court will also consider plaintiff's exhibits attached to his December 1, 2006, amended complaint, his motion to add new evidence of medical negligence and request for additional award (and exhibits attached thereto), filed on February 19, 2009, and his memorandum and declaration, filed on June 1, 2009 (with exhibits).

1

Amended Complaint[2]

This action, originally filed on September 6, 2006, is proceeding on an amended complaint, filed on December 1, 2006, as modified by Order, filed on July, 2, 2007, dismissing Grannis as a defendant. Defendants are Medical Technical Assistant (MTA) Olver (erroneously sued as "Oliver"), Dr. Lee; Dr. Sahota; Kim Stocker. The gravamen of plaintiff's action is that defendants violated plaintiff's rights under the Eighth Amendment by deliberate indifference to a serious medical condition. Plaintiff was in severe pain for three days and was unable to walk normally. Defendant Olver was deliberately indifferent in refusing him treatment when plaintiff tried to explain his medical problem, stating that "it is not a medical emergency," and only providing Ibuprofen which did not stop his pain. Amended Complaint, pp. 3, 19.

Plaintiff walked in pain for fourteen (14) days before receiving, in addition to Ibuprofen, Vicodin, "which never worked"; thus, defendant Lee, who saw plaintiff on December 30, 2005, and again on January 9, 2006, provided inadequate pain medication and made no real effort to determine the source of the pain in his leg, which still hurt but not so severely. Amended Complaint, pp. 3, 19, 51.

Defendants Stocker and Sahota denied plaintiff's request for an M.R.I.,[3] on February 27, 2006, and on March 10, 2006, which plaintiff sought so that the major cause of his pain could be diagnosed. He states, although it is less severe, that he is still in pain. Id., at 51. Plaintiff primarily seeks money damages including punitive in the amount of ten thousand dollars, but states he also seeks declaratory relief (although he apparently, but mistakenly, believes declaratory relief may come in the form of money damages (see id., at 3, 52)). In addition, he seeks injunctive relief, but apparently only in the form of prohibiting defendants and

---

[2] The allegations of the amended complaint have previously been set forth in the June 10, 2009, Findings and Recommendations, adopted by Order, filed on August 11, 2009. Appropriate modifications have been made.

[3] Magnetic Resonance Imaging.

2

their agents from retaliating in any manner against him, including transferring him in retaliation for filing this action.[4]

Addendum

In a filing dated February 19, 2009, plaintiff filed a motion and some additional medical record exhibits, a copy of an M.R.I. taken on December 15, 2008. Motion to Add Evidence of Medical Negligence and Request for Additional Award. Plaintiff therein contends that more injury occurred due to defendants' failure to provide an M.R.I. and that he now needs surgery on his left knee. Id. at 2. Plaintiff therefore requests an additional two hundred thousand dollar money damages award for a total of two hundred and ten thousand dollars. Id. at 2-3.

Motion for Summary Judgment

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met. "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes

---

[4] As noted in the adopted June 10, 2009, Findings and Recommendations at note 1, plaintiff has previously been informed that seeking prospective injunctive relief for an alleged violation of plaintiff's right to adequate medical care for a serious medical condition in the form of a prohibition against retaliating against plaintiff for filing the instant complaint is inapposite as such retaliation would constitute a separate violation of plaintiff's constitutional rights for which plaintiff would be free to proceed in a separate action against the defendants or any other who acted in such retaliation. Moreover, an injunction to defendants "not to violate the law" is inappropriate. See Order, filed on September 19, 2008, p. 2, n.1. Further, it appears that plaintiff has been transferred to another facility, California Men's Colony-East (CMC), rendering any claims against the defendants at Folsom State Prison (FSP) moot. See Sample v. Borg, 870 F.2d 563 (9th Cir. 1989); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986). See also Reimers v. Oregon, 863 F.2d 630, 632 (9th Cir. 1988). At CMC, plaintiff submits evidence that he received the M.R.I. that he had sought at FSP and has received arthroscopic surgery on his left knee and is receiving physical therapy.

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

\\\\\

4

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

While the standards for summary judgment are well established, the procedural rules governing such motions in pro se cases are in disarray. A recurring issue in this case is the lengths to which the undersigned should go in "helping" the pro se plaintiff in his case. The Ninth Circuit may be of two conflicting minds on the issue. On the one hand, we are told that pro se litigants must follow the same rules of procedure that govern other litigants. King v. Atiyeh, 814 F.2d 565, 567(1987) (waiver of originally pled but omitted causes of action in

amended complaint).  Also, the district court has no "obligation to give notice of Rule 56's evidentiary standards" to "pro se litigants in the ordinary civil case," and "admissible evidence" must be submitted.  Jacobsen v. Filler, 790 F.2d 1362, 1364, 1365 (9th Cir.1986).  See also Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1550 (9th Cir. 1990) ("well established that unauthenticated documents cannot be considered on a motion for summary judgment").  Finally, as a general rule, the judge does not have to scour the record in efforts to find evidence which might defeat summary judgment, i.e., the litigant must supply the needed evidence within the motion or opposition.  See Carmen v. San Francisco Unified School Dist. 237 F.3d 1026, 1030 (9th Cir. 2001) stating the rule for represented parties: "Other circuits are not unanimous, but Forsberg is both binding on us and consistent with the majority view that the district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein.  But see Jones v. Blanas, 393 F.3d 918, 922-23 (2004) ("[b]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones contentions offered in motions and pleadings [signed under penalty of perjury].  See also Fraser v. Goodale, 342 F.3d 1032, 1036037 (9th Cir. 2003) (form of evidence submitted is irrelevant as long as the evidence *might be* made admissible at trial.)

Recently, in Richardson v. Runnels, __F.3d__, 2010 WL 276181, *2 (9th Cir. Jan. 26, 2010), the Ninth Circuit declined to approve the enforcement by the district court of procedural  rules against a pro se defendant opposing summary judgment when the pro se was in clear violation of the local rules, but more importantly, had not produced any admissible evidence to oppose the motion.  The case was decided adversely to defendants on defendants' statement of facts to the Ninth Circuit as the district court had not reached the merits.  The implicit rule of Richardson appears to be that failure by a pro se to comply with procedural rules governing summary judgment motions simply places the burden upon the district court to ferret out the opposition for a pro se plaintiff.

\\\\\

*Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

\\\\\

1  It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants. The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

*Undisputed Facts*

Although plaintiff does not appear to specifically acknowledge or substantively address defendants' statement of undisputed facts, based on the medical record documentation presented by plaintiff and relied on by defendants, as well as the declarations of the parties, certain facts can be deemed undisputed. Defendants expressly rely on the exhibits produced by plaintiff in his amended complaint and in his motion to add new evidence and do not challenge the records based on any lack of authentication. Motion for Summary Judgment (MSJ), pp. 5-6. It is undisputed that at all relevant times, each defendant was employed by the California Department of Corrections (CDCR) at Folsom State Prison (FSP) and that defendant Lorraine Olver was a Medical Technical Assistant (MTA) and LVN; defendant Benjamin P. Lee, M.D., was a licensed physician and surgeon; defendant Paramvir Sahota, M.D., was a licensed physician and surgeon and was Chief Medical Officer (CMO); and defendant Kim Stocker was a Governmental Program Analyst, Health Care Appeals Coordinator.

Plaintiff filed a grievance, dated December 28, 2005, wherein he states that he had been in severe pain for three days, could not walk normally, and tried to explain his medical problem to the MTA but was refused treatment, the MTA stating that "it is not a medical emergency"; by his grievance, he sought treatment for his leg and medication to alleviate the pain. AC, p. 19. Defendant Olver agrees that she did not find that plaintiff had an "emergency" medical need. MSJ, Declaration of Lorraine Olver, ¶ 6.  Defendant Olver declares that at a Dr. Dazo's direction on the telephone, she gave plaintiff one 800 mg dose of Ibuprofen, while plaintiff maintains, in his verified amended complaint, it was a 600 mg dose. AC, pp. 3, 19 (or Exh. A to MSJ, p. 4); MSJ, Declaration of Lorraine Olver, ¶ 5. No medical record is submitted to substantiate either dosage on that date, so suffice it to say that defendant Olver gave plaintiff an Ibuprofen of at least 600 mg.[5] Plaintiff was prescribed, according to the copies of physician's orders for medication, with an entry by a Dr. Dunlap, dated December 28, 2005, 500 mg of Tylenol three times a day for 30 days; on December 30, 2005, plaintiff was prescribed Prednisone (for inflammation), 800 mg of Ibuprofen for 60 days, and Vicodin (for pain). AC, pp. 27-29.; MSJ, Olver Dec., ¶ 5. In addition to December 28, 2005, plaintiff was seen on December 30, 2005, January 9th, 13th and 25th of 2006, and February 6th and 16th for medical care and for medication prescriptions. AC, Exh. B, pp. 27-30, 33-36, 38-41, 44-46; MSJ, Declaration of defendant Dr. Benjamin P. Lee, ¶¶ 5-6. AC, p. 26; MSJ, Lee Dec., ¶ 5. An x-ray was ordered for plaintiff on January 9, 2006, and performed on January 11, 2006, by Advanced Imaging Centers; views of the right hip showed "mild degenerative changes" with a finding of "no focal bony destructive lesions or fractures"; views of the left hip resulted in findings of "[m]oderate degenerative changes ... of the left hip with subchondral cyst formation, sclerosis, and superior joint space narrowing, as well as bone spur formation." AC, Exh. B, pp. 21, 23-26. 30-31; Lee

---

[5] Given that his prescription for Ibuprofen two days later was in the amount of 800 mg, it is most likely that is the dosage he was given by defendant Olver at Dr. Dunlap's direction (see next sentence in text).

Dec, ¶5.[6]  Plaintiff asserted that his December 30, 2005, and January 6, 2006, medical visits were unsatisfactory because he was "only examined w[h]ere he was in pain" with "no attempt" made "to find the source of the pain."  AC, Exh. B, p. 20.  Plaintiff states that the pain medications of Ibuprofen and Vicodin were not working and that he requested Methocarbamol which allowed him to walk.  Id.   In response to plaintiff's 602 grievance, defendant Lee performed a physical examination and interview of plaintiff on January 25, 2006; defendant Lee states that he reviewed the x-rays and report and ordered Methocarbamol for plaintiff's back muscle spasms due to plaintiff's dissatisfaction with his then current medications; defendant Lee also submitted, on the same day, January 25, 2006, a Health Care Services Physician's Request for Services, ("CDC 7243") to the Medical Authorization Review Committee ("MARC") for approval of an M.R.I. of plaintiff's lumbar spine, although plaintiff told defendant Lee he was feeling better.  AC, Exh. B, pp. 39-41; MSJ Lee Dec., ¶ 5.  On February 6, 2006, defendant Lee noted, inter alia, that plaintiff indicated on that day that the pain in his left lower back and flank was "much better," but that he "still strongly wishes to have M.R.I. of lumbar spine."  AC, Exh. B, p. 45.

*Discussion*

Plaintiff, in an opposition, filed on June 15, 2009 (docket # 61), maintains that defendants were deliberately indifferent to his medical condition, denying him adequate medical care.  In his declaration in opposition, plaintiff avers that he was, in December, 2005, "in extreme pain" and could not put pressure on his left leg.  Plaintiff's Declaration (Dec.) in Opposition (Opp.), ¶ 1.  At the MTA office, he was told by defendant MTA Olver regarding his condition:

---

[6] Although defendant Lee does not reference the right hip at all and states that as to the left hip, the x-ray showed "mild to moderate changes of the left hip," the language quoted above comes directly from the x-ray report, which finds mild changes in the right hip and moderate, but not mild to moderate, changes in the left hip.  MSJ, Lee Dec., ¶ 5.  In addition, defendants in the separate statement of undisputed facts reference defendant Lee's declaration as support for the erroneous assertion of a finding of moderate degenerative changes of plaintiff's *right* hip [emphasis]. See MSJ, defendants' undisputed fact # 9.  As is often the case in pro se cases, the evidence raises as many questions as it answers.  It is completely unclear at this point why the hip was x-rayed if plaintiff's problems were in his knee.

1  "This is not a serious injury." Id.  When plaintiff explained his need to see a doctor, defendant
2  Olver told plaintiff that all she could do was give him some Tylenol[7]; when he explained the
3  severity of his condition, Olver became irate and said: "Look, get the hell away from the window.
4  I'm not giving you a goddamn thing," then closed the window. Id.   When, in January, 2006,
5  plaintiff was still in extreme pain after taking Vicodin and went to defendant Olver to explain,
6  she told him: "Do not bother me with this issue again; you look fine to me; if you come back
7  again, I'm going to write you up for faking an injury to obtain pain medication for drug use." Id.,
8  at ¶ 2.  Plaintiff also asserts that no doctor at FSP would grant his request for an M.R.I. and that it
9  was not until he arrived at California Men's Colony-East (CMC) in 2008 that doctors permitted
10 him an M.R.I., and that he is now in physical therapy having received surgery on his left knee.
11 Id., at ¶ 3.

12        Plaintiff provides additional detail in a memorandum and declaration, filed earlier
13 on June 1, 2009 (docket # 57).  Plaintiff underscores that defendants denied him an M.R.I. and
14 maintains that when he had an M.R.I. after being transferred to CMC, it revealed that he had a
15 torn lateral meniscus (misspelled by plaintiff as "minicus") in his left knee. Id., at 1.

16        *Defendant Olver*

17        As to defendant Olver, she maintains that plaintiff complained of back pain, rather
18 than leg pain, on December 28, 2005, and that, as noted, she gave him a dose of Ibuprofen at Dr.
19 Dazo's direction, and that plaintiff was seen by Dr. Dunlap that morning, whereupon plaintiff
20 was prescribed 500 mg of Tylenol, to be taken three times a day. MSJ, Olver Dec., ¶ 5.
21 Although the defendants do not submit an affidavit by Dr. Dunlap, the record presented by
22 plaintiff appears to substantiate at least that Dr. Dunlap did prescribe the Tylenol on that day as
23 noted among the undisputed facts above. Defendant Olver declares that after his return on
24 December 30, 2005, plaintiff was prescribed the Prednisone, Ibuprofen and Vicodin and that she

---

[7] Both defendants and plaintiff appear to interchangeably reference Ibuprofen or Tylenol as what she offered him.

"had no further personal involvement with plaintiff regarding the allegations of this action." MSJ, Olver Dec., ¶ 5. Again, the records presented show that plaintiff was indeed provided, or at least noted as prescribed, the medications described on that date, although they do not indicate defendant Olver's involvement in that process. Defendant Olver does not specifically dispute plaintiff's assertion that she told him that his condition was not serious or to get away from the window, but plaintiff disputes that her last involvement with him was on December 30, 2005, as he maintains that she turned him away in January of 2006, when he went to complain of the medication not being adequate for his pain. This, however, does not appear to be a particularly germane dispute, as plaintiff complains that he was not provided medication other than Ibuprofen for 14 days, at the same time that the medical record he presents indicates otherwise, i.e., that plaintiff was prescribed both Vicodin and Prednisone within two days after he initially complained to defendant Olver about his pain. Plaintiff is a little confusing on this point, as he also complains that the Vicodin he did receive did not adequately treat his pain. Defendant Olver also includes, as Exhibit A to her declaration, a description of her duties as an MTA. Although an MTA "participates in the evaluation of patients' needs," his or her duties do not extend to making a medical diagnosis in a case such as plaintiff's; nor does her failure to consider the condition of which he complained to rise to the level of a medical emergency a deprivation of his constitutional rights.

        Despite defendant Olver's not treating plaintiff's condition as a medical emergency, he was offered medication and nevertheless was seen by medical staff later on the day plaintiff approached her on December 28, 2005, or at the very latest, by December 30, 2005. Plaintiff's reference in his opposition to having had another encounter with a hostile defendant Olver on an unspecified day in January, 2006, is neither sufficiently supported by the record and is denied by defendant Olver. In any event, defendant is correct that even if she was short with him, plaintiff does not thereby raise a genuine issue as to whether he was subjected to a constitutional deprivation, in her capacity as an MTA, nor does her not characterizing his

medical condition as an emergency, especially since the records indicate he was seen by a physician, apparently non-defendant Dr. Dunlap, later on the same day. The record does show, as defendants contend, that plaintiff was provided Ibuprofen by defendant Olver and that later day, he was seen by medical staff, apparently non-defendant Dr. Dunlap, and prescribed further medication, unhelpful though plaintiff insists that it was in alleviating his pain. While defendant Olver may have been rude to plaintiff which was uncalled for, that is not enough to render her actions a deprivation of his Eighth Amendment rights, as defendants maintain. Reply, p. 2. The motion should be granted as to defendant Olver.

*Defendant Lee*

Although plaintiff alleges that defendant Dr. Lee, on December 30, 2005, and January 9, 2006, that defendant Lee only examined where he was in pain and did not attempt to find the source of the pain, the evidence presented, even by plaintiff, lends support to Dr. Lee's declaration that other medical staff treated him on December 28, 2005, December 30, 2005, and January 9, 2006, and that Dr. Lee did not see plaintiff until January 25, 2006. AC, Exh. B, pp. 20-30, 36, 39-42; MSJ, Lee Dec. ¶ 5. Therefore, plaintiff's complaints related to December 30, 2005, and January 9, 2006, within his complaint regarding this defendant's lack of appropriate medical treatment are unsupported even by the record he produces. In addition, plaintiff does not dispute that the MRI he sought was requested by defendant Lee. It also appears that defendant Lee, inter alia, prescribed Methocarbamol that plaintiff sought in a grievance, and that, on February 6, 2006, plaintiff reported to him that his pain was better. That defendant Lee's request for an M.R.I. for plaintiff, a procedure which would have had to be performed outside of the prison facility, was later denied by other defendants and/or a committee does appear to fall outside of this defendant's control. MSJ, Lee Dec., ¶ 7. Plaintiff does not raise a genuine material fact as to this defendant's actions with regard to a violation of his constitutional rights. The motion as to defendant Lee should be granted.

\\\\\

14

*Defendants Stocker and Sahota*

Plaintiff's evidence does not dispute that on February 16, 2006, the Medical Authorization Review Committee February 16, 2006, denied defendant Dr. Lee's January 25, 2006, request for an M.R.I. for plaintiff. However, he alleges in his complaint defendants Stocker and Sahota denied plaintiff's request for an M.R.I., on February 27, 2006, and on March 10, 2006, respectively. Although not specifically asserted, the basis for this allegation appears to be the first level appeal response to plaintiff's 602 grievance regarding the lack of adequate treatment for his leg, signed by defendant Stocker, designated as "partially granted" on February 27, 2006; and the second level appeal response, dated April 9, 2006, not March 10, 2006, designated a denial, and signed by defendant CMO Sahota. AC, Exh. B, pp. 19-24.

In the first level appeal response, defendant Stocker, after noting that plaintiff had been interviewed by defendant Lee on January 25, 2006, that his health record indicated he had been seen six times for his back and leg pain since his December 28, 2005, request for treatment (on dates previously noted above), and that plaintiff had been prescribed Prednisone and Vicodin on December 30, 2005, states, in relevant part:

> An x-ray of your right hip was performed through Advanced Imaging Centers on January 11, 2006, with a finding of *moderate degenerative changes of the left hip*. Dr. Lee submitted a *CDC 7243, Health Care Services Physician Request for Services* form to the Medical Authorization Review Committee (MARC) on January 25, 2006, for approval of a Magnetic Resonance Imaging (MRI) of your lumbar spine. The MARC denied this request on February 16, 2006, as you had indicated in previous medical visits that your condition was improving.

AC, Exh. B, p. 21 [emphasis in original].

The decision was apparently deemed "partially granted" because plaintiff was at the time being prescribed various medications for his medical complaint. Defendant Stocker maintains that as a Health Care Appeals Coordinator (or medical appeals analyst), she is not a medical doctor nor does she have any medical training or certification. MSJ, Declaration of Kim Stocker, ¶ 2. She avers that her duties were administrative, that she had no responsibilities to

15

provide care or treatment to inmates, that her only involvement occurred at the first level of his administrative appeal. Id., at ¶¶ 4-5. According to defendant Stocker, her job was simply to assure that the issues raised by plaintiff had been addressed by the appropriate medical staff, but it was not to "second guess the opinions, conclusions or recommendations of treating physicians." Id., at ¶ 5.

Despite this defendant's assertion that her job is purely administrative, if it is her responsibility to determine whether an inmate's medical concerns in an appeal have been appropriately addressed, it is difficult to discern how she can do so with no medical training whatsoever. On the other hand, plaintiff is complaining that she denied his request for an M.R.I. and, strictly speaking, the evidence does not point to such a conclusion. Rather, she simply appears to be reporting the action of a committee and what was apparently reported as the basis for that decision, that plaintiff's condition, according to plaintiff, was improving. Of course, in the same notes that defendant Lee made about plaintiff indicating he was feeling better, there is also a notation that plaintiff still felt a strong need for an M.R.I., i.e., the logical inference is that plaintiff wanted to make sure that the latest pain medication was not simply masking pain in a somewhat improved manner, but rather wanted to address the underlying medical condition. Nevertheless, this individual, who does not appear to have had any power to revoke the MARC's decision to deny the M.R.I. does not appear to be an appropriate defendant and the motion should be granted as to this defendant.

With regard to defendant Sahota, however, the Chief Medical Officer, the conclusion is different. Defendant Sahota states that as CMO, it is his job "to implement the community standard of medical care and facilitate transfer of patients to outside medical facilities when needed." MSJ, Declaration of Paramvir Sahota, M.D., ¶ 2. This defendant states that when he made the decision in his second level appeal response, it was "primarily based on Benjamin Lee, M.D.'s review" of plaintiff's case, as well as the file on the appeal. Id., at ¶ 6. Defendant Sahota determined, nevertheless, despite defendant Lee's submission of a physician's

16

request for a lumbar M.R.I. for plaintiff, that plaintiff was receiving the "medically necessary care and treatment" without the M.R.I., based on records indicating that his symptoms were improving. Id., at 7. This defendant also makes that point that an inmate may not demand a particular course of treatment. Id.

The M.R.I. of his left knee that plaintiff received on December 15, 2008, after having been transferred to CMC, set forth the following findings:

> MENISCI: Medical meniscus normal. Lateral meniscus is truncated and small consistent with post partial meniscectomy change. Some intramensical signal is seen without definite linear abnormalities to suspect new tear.
> LIGAMENTS: Cruciate and collateral ligaments are normal in appearance.
> BONES: A 1.5-cm osteochondral defect is noted in the posterior non-weightbearing lateral femoral condyle with a small overlying cartilage defect noted.
> CARTILAGE: Diffuse mild articular cartilage thinning is seen in the lateral compartment with early mild marginal osteophytonia.
> JOINT SPACE: A tiny effusion is present. No loose bodies are seen.

Motion to add new evidence, p. 5; MSJ, Exh. B, p. 30.

The M.R.I. report includes the following conclusion:

> 1. 1.5-cm osteochondral defect posterior non-weightbearing lateral femoral condyle.
> 2. Post partial meniscectomy lateral meniscus without definite new tear.
> 3. Mild diffuse early lateral compartment articular cartilage thinning and minimal early marginal osteophytosis consistent with mild osterarthritis.

Id.

In the declaration accompanying the June 1, 2009, memorandum, plaintiff avers that arthroscopic (misspelled as "ortho-scopic") surgery was performed on his left knee on March 2, 2009. Plaintiff's Dec. at ¶ 2 (docket # 57) & Exhibit B, including, inter alia, a copy of a surgery scheduling sheet, noting March 2, 2009, as the date for an "arthroscopic lateral

\\\\\
\\\\\

menisectomy"[8] [sic] for plaintiff's left knee. Additionally, plaintiff claims that defendants' failure to provide an M.R.I. to discover the source of the pain that inhibited his ability to walk resulted in a more serious injury that was discovered when he did finally have an M.R.I. Motion to add new evidence (docket # 51), pp. 1-2. He appears to conclude that the delay is what necessitated the subsequent surgery that he had on his left knee. Id. However, plaintiff does not provide a medical expert's affidavit to that effect and the court is unable to draw that inference simply based on the records submitted.

However, plaintiff has raised a genuine issue of material fact with regard to defendant Sahota's denial of his second level appeal, wherein plaintiff expressed his belief that he needed an M.R.I. to discover the cause of his leg pain, and one doctor requested same. AC, p. 20. While the M.R.I. and subsequent arthroscopic surgery on plaintiff's left knee is not enough to lead the court to conclude that this denial led to further damage to plaintiff's knee, it is sufficient to suggest that plaintiff's claimed continued pain and lack of surgical treatment up to that point can be ascribed to this omission. And clearly, despite the denial by the medical authorization review committee, defendant Sahota does not suggest that he could not have determined that the M.R.I. was appropriate; in fact, he indicates that it would have been within his authority in his capacity as CMO. While defendant's points are colorable, it is not possible to firmly rule out deliberate indifference. While one can enunciate the standards, many jurists simply view application of those standards at this time as an issue of fact, i.e., the denial of a diagnostic procedure may or may not be responsible for the long term pain alleged by plaintiff. The motion as to defendant Sahota should be denied.

\\\\\

\\\\\

---

[8] The correct spelling/name of this procedure appears to be "meniscectomy." See, M.R.I. report cited above and, e.g., "Arthroscopic Lateral Meniscectomy" by Dieter Kohn and Berend T. Berendsen in *Orthopedics and Traumatology,* vol. 1, no. 4, December, 1992 (revised from *Operat. Orthop. Traumatol*. 1 (1989), 53-61 (German Edition).

Motion for Sanctions

Plaintiff seeks sanctions, although he does not suggest what precise form they should take, for defendants having contended that plaintiff had failed to submit admissible evidence in support of his (plaintiff's motion for summary judgment). Motion, p. 1. Plaintiff also states that the court noted that defendants had failed to comply with L.R. 5-137(b) in seeking an extension of time to file a motion for summary judgment, and sought a second extension of time because they were not prepared. Id. Plaintiff accuses defendants of engaging in delaying tactics which has caused him to suffer prejudice. Id., at 2. He contends that after his surgery, he had to walk with a cane and that the day after surgery, he received a 115 disciplinary action because he was unable to get out of bed for count time. He requests a settlement conference or that the matter be set for trial.

As to plaintiff's motion for summary judgment, the court found it to be deficient and it was denied. See Findings and Recommendations, filed on June 10, 2009 (docket # 59), adopted by Order, filed on August 11, 2009 (docket # 66).[9] As for defendants' two requests for extension of time, the court did note that defendants' counsel had apparently failed to comply with L.R. 5-137(b) by not filing a proposed order in CM-ECF and by not emailing such an order to the undersigned in word processing format. Because the request was not considered at the time it was filed, the court granted defendants an extension of time to file their motion for summary judgment beyond the deadline set forth in the scheduling order, but also cautioned defendants to file their requests in compliance with L.R. 5-137(b) in future. See Order, filed on April 28, 2009. Defendants then filed a second ex parte request for an extension of time, this time in compliance with the relevant Local Rule and defendants were granted a final extension of an additional seven court days to file their motion for summary judgment on June 1, 2009, which defendants did. The court will not impose sanctions for requests for which the undersigned

---

[9] Nevertheless, the court has permitted the documents plaintiff submitted with his motion to add new evidence as part of his opposition to defendants' motion for summary judgment.

found a sufficient basis to grant. It is unclear how plaintiff's having received a disciplinary report at another facility because he had surgery while housed at another facility constitutes prejudice that plaintiff suffered as a result of defendants being permitted extensions of time to file their summary judgment motion. In any event, the court herein recommends that this matter proceed as to one of the defendants. Plaintiff's motion for sanctions is denied.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for sanctions, filed on June 3, 2009 (docket # 58), is denied.

IT IS RECOMMENDED that defendants' June 1, 2009 (docket # 56), motion for summary judgment be granted in part and denied in part, as follows: GRANTED as to defendants Olver, Lee and Stocker, and DENIED as to defendant Sahota, and this matter proceed to trial on a claim for money damages as to defendant Sahota.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven (7) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). *The parties are further cautioned that there will be no extension of time for the filing of objections due to the demands of the court's calendar.*

DATED: 02/16/2010                               /s/ Gregory G. Hollows

                                                GREGORY G. HOLLOWS
                                                UNITED STATES MAGISTRATE JUDGE

GGH:009
prat1993.msj2